The SPORTS AUTHORITY, INC., and
Intelligent Sports, Inc., Plaintiffs,

v.

ABERCROMBIE & FITCH, INC.; Mast
Industries, Inc.; and The Limited,
Inc., Defendants.

No. 95–73604.

United States District Court,
E.D. Michigan,
Southern Division.

March 25, 1997.

R. Terrence Rader, Bloomfield Hills, MI, for plaintiffs.

Herschel Fink, Detroit, MI, Frank Colucci, New York City, for defendants.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I. Introduction

This is a trademark infringement case under the Lanham Act, 15 U.S.C. § 1114. Plaintiff The Sports Authority, Inc., and its subsidiary Intelligent Sports, Inc. (collectively "TSA") are suing defendant Abercrombie & Fitch, Inc.—as well as The Limited, Inc., and Mast Industries—claiming Abercrombie & Fitch infringes a TSA trademark by using the word "authority" on hangtags, labels, and logos. Abercrombie & Fitch has moved for summary judgment, chiefly arguing that it uses the word "authority" in a descriptive sense and, in the alternative, that there is no likelihood of confusion in its use of the word "authority." Defendants also argue that The Limited and Mast Industries should be dismissed because they have no connection to Abercrombie & Fitch's use of the word "authority."

For the reasons that follow, Abercrombie & Fitch's motion is granted in part and denied in part.

### II. The Parties

#### A. Abercrombie & Fitch

Founded in 1892, Abercrombie & Fitch (A & F) was historically a New York City retail store that sold sporting goods, leisure items, games, and gifts. Notably, it sold sporting goods to customers of wealth and distinction, counting among its customers the Duke of Windsor and Presidents Roosevelt (both Theodore and Franklin), Taft, Coolidge, Harding, Wilson, Hoover, Eisenhower, and Kennedy. It also outfitted Charles Lindberg, Howard Hughes, Amelia Earhart, and Ernest Hemingway for flights and hunting trips.

The original A & F went bankrupt in 1976. In 1977, Oshman's Sporting Goods, Inc. (Oshman's) purchased the rights to the A & F name and A & F's house charge account list; its attempts to revive A & F failed. In 1988, The Limited (Limited) [1] acquired A & F from Oshman's. The chairperson and president of Limited, Leslie H. Wexner (Wexner), testified in deposition that Limited purchased A & F because it was interested in acquiring "established brands." According to Wexner, his knowledge of A & F's reputation and merchandise was:

> The reputation in the marketplace, in terms of outdoor wear and casual clothes was what attracted me to Abercrombie. In the course of acquisition, through your due diligence you learn about the history of the business. . . .
>
> There was a sense that Abercrombie has been outfitters in connection with the outdoors. I don't remember if it was before or after the acquisition, I remember seeing a catalog. I could have seen it when I was a kid, but that was always the reference to outdoor stuff was Abercrombie, I think.

Wexner testified that the final decision to acquire A & F was the "brand name," because "[i]t meant outdoor clothing, casual clothing, ancestors. The fact that the business was established in 1892 was very important to us."

Limited changed the focus of A & F merchandise to attract younger consumers, who typically spend more money on clothing. Historically, A & F offered deluxe sporting goods. However, Limited stocked A & F with clothing that is fairly traditional and connotative of the outdoors, often described as "sportswear" or "casual clothing." The industry term for A & F's new focus is "softline" merchandise.

Today, more than 102 A & F stores throughout the United States exclusively sell men's and women's apparel and a small line of fragrances, all under the A & F house brand. All of the merchandise in A & F stores is marked with the A & F trademark on labels or hangtags. Many garments at A

---

1. The Limited, Inc., has been called an "empire of specialty chains," operating such retail stores as The Limited, Express, Lerner New York, and Victoria's Secret. Laura Bird, *Limited Enters Sporting–Goods Market with Acquisition of Galyan's Trading*, Wall St. J., July 5, 1995, at A4.

& F also feature the A & F trademark as a design graphic. For example, A & F sells sweatshirts with its trademark logo emblazoned on the front. A & F has sold in excess of $769 million of A & F merchandise since 1988, and has spent in excess of $9.3 million in advertising since 1988.

### B. The Sports Authority

Organized in 1987, TSA owns and operates 166 sporting goods stores under its service mark "The Sports Authority." TSA stores sell sports equipment of all kinds—for outdoor activities like camping, hunting, and fishing, as well as for sports like football, tennis, skiing, golf, and the like. The industry description of this merchandise is "hardline," i.e. traditional sports equipment. TSA stores also sell sports apparel and outdoor casual clothing, or softline items, which account for 50% of annual sales. Some of TSA's softline merchandise is similar to A & F's.

TSA stores, at over 40,000 square feet, are very large and sell merchandise with over 900 brand names such as Nike, Prince, and Rossignol. TSA stores have been very successful, having sold in excess of $2 billion in merchandise in the period 1987–1994.

TSA has registered eight marks with the United States Patent and Trademark Office. For example, TSA holds No. 1,527,526 (service mark for "The Sports Authority" on apparel) and No. 1,821,430 (trademark for the words "The Sports Authority" on apparel). Most relevant to this action is No. 1,245,417 (trademark for "authority" on apparel) (Attachment 1 to the Memorandum and Order). TSA acquired this last trademark in 1995, after filing the original complaint in this action.

Although the majority of the merchandise that TSA sells is nationally branded, each item has a price tag or hangtag with the designation "The Sports Authority." A typical tag features the following logo:

In advertising, TSA designates itself as, *inter alia*, the "Outdoor Authority"; "Superbowl Authority"; "Footwear Authority"; and "Shoe & Apparel Authority." TSA also uses such phrases on its website. For example, the following newspaper advertisement designates TSA as the "Outdoor Authority":

TSA apparently does not tag its merchandise under the mark "outdoor authority," but uses this phrase exclusively to promote outdoor equipment or clothing in advertisements, either in newspapers or electronically. TSA has applied to register "outdoor authority" with the United States Patent and Trademark Office, but as yet does not hold a trademark for the phrase.

### C. The Other Defendants

A & F and Mast Industries (Mast) are wholly owned subsidiaries of Limited. Mast is a "sourcer," or supplier of goods, for A & F.

There is a dispute over whether Limited and Mast are involved in any day-to-day business operations of A & F or have any connection with A & F's use of "authority." A & F says that Limited and Mast have no connection with its promotional activities. Seth Johnson, the vice president and chief financial officer of A & F, stated in an affidavit:

2. A & F says that it has used "authority" as a descriptive word since 1988; TSA alleges that it did not make use of the word until 1989–1990.

[d]ecisions as to which products, including those bearing the word "Authority", will be sold and the manner in which they will be advertised, marketed and offered for sale are made solely by A & F and its management team.

TSA responds that Limited is involved in this process because A & F designer Marc Gobé (Gobé) testified in deposition that Wexner, the chair and president of Limited, was involved in the approval process to use "authority." Further, TSA argues that Mast is a proper defendant because it manufactures merchandise for A & F.

### III. The Case

### A. TSA's Concerns

TSA's concerns arise from A & F's use of "authority" on its hangtags, labels, logos, and clothing imprints. Although A & F has used "authority" since at least 1989,[2] TSA does not object to early use of the word. Gobé originally designed a label in ornate, "English"-style script, designating A & F as, for example, "The Authority in Haberdashery and

Since approximately 1988 or 1989, A & F has sold in excess of $6 million of goods bearing "authority."

Fine Products for Gentlemen." TSA objects to more recent uses of "authority," which began appearing on clothing and tags within the last twelve to eighteen months, according to TSA.

A & F has recently used "authority," for example, by proclaiming itself to be "the original authority of quality craftsmanship" or the "authority in durable goods." Many A & F tags look like the following:

"Authority" has greater prominence in a few A & F logos. For example, the following imprint is found on an A & F t-shirt:

According to Gobé, A & F uses "authority" to evoke a history of providing quality durable goods and gives the word prominence as a "descriptive phrase." The president and chief executive officer of A & F, Michael Jeffries (Jeffries), testified in deposition that A & F placed the phrase "The Original Outdoor Authority" under the name "Abercrombie" on a t-shirt because:

[i]t was just a descriptive of Abercrombie & Fitch. It was just—it kind of described our heritage. . . .

I've got to be straightforward with this. The words that are on here, other than Abercrombie, are absolutely not important. What I demand in graphic Ts [i.e., t-shirts] is that they be attractive, that they have a sense of our heritage, and that Abercrombie is the brand and that's it.

TSA also claims that A & F promotes confusion by placing patent and trademark symbols next to phrases such as "Authority in Durable Goods." An offending placement of patent and trademark symbols according to TSA is the following:

Abercrombie & Fitch Co.
THE ORIGINAL
GENUINE ESTAB 1692 QUALITY
The Authority in Durable Goods
REGISTERED U.S. PATENT OFFICE
GENUINE STAMP BRAND GOODS

In response, Jeffries says that the "line is meaningless, it's a descriptive.... It's a meaningless line on the label, totally."

TSA is also concerned because, prior to July 1995, Limited acquired Galyan's Trading Co., formerly a closely held chain of sporting goods stores. TSA says that Galyan's is a direct competitor. In an editorial in the monthly magazine *Sports Trend* in August 1995, a writer speculated that Limited's acquisition of Galyan's was what the sports retail industry "needs least: one more ambitious competitor with pockets that are about as deep as pockets can get." The writer engaged in "juicy speculation" as to whether Limited would prompt Galyan's to develop a private label:

> [I]t's easy to envision, say, Abercrombie & Fitch goods on Galyan's custom made shelves—especially since Wexner is said to have considered private brands for sporting goods once before.

Wexner has denied any reports that Limited plans to place A & F merchandise in Galyan's; he cannot explain the speculation in the *Sports Trend* article.

### B. TSA's Complaint

TSA contends that A & F's use of "authority" implies that TSA is the source or sponsor of A & F's merchandise, and that therefore there is a likelihood of confusion. TSA says that A & F is creating such confusion to compete with TSA. TSA also says that A & F has placed "authority" in close proximity to

trademark and patent symbols to suggest that A & F has a right to use the word.

In its complaint, TSA makes four claims under federal law: (1) trademark infringement; (2) unfair competition; (3) dilution; and (4) false advertising. TSA also makes state common law claims of trademark infringement and unfair competition, as well as unjust enrichment.[3]

### C. A & F's Response

A & F moves for summary judgment, claiming that its use of the word "authority" does not infringe TSA's mark. It further claims that its use does not create unfair competition, dilute TSA's mark, or falsely advertise its merchandise. Defendants also move to dismiss Limited and Mast as defendants.

### IV. Survey Evidence

Before addressing the merits of A & F's motion, the Court will consider A & F's challenge to survey evidence offered by TSA. In papers submitted after a September 25, 1996 hearing on the motion for summary judgment, TSA offered a survey of 200 interviewees. The survey analyzed current consumer awareness of A & F and potential confusion between the parties' uses of "authority." In summary, the survey says:

1. Lisa T. Nielsen (Nielsen) designed and conducted the survey on October 15 and 17, 1996. The survey was to "determine the strength of the Abercrombie & Fitch brand name and to determine the commercial impact and likelihood of confusion with respect to labels having Abercrombie & Fitch, the word 'Authority,' and/or other indicia."

2. Nielsen interviewed 200 people in groups of three to five. She describes them as "representative of adults aged 18 to 60."

3. Nielsen first asked them if they were familiar with the following five stores: MC Sports, Bavarian Village, A & F, Dunham's, and TSA. Eighty-nine per-

---

**3.** TSA additionally claims dilution in violation of Michigan common law, but there is no action for dilution under Michigan law. *Aero–Motive Co. v.* *U.S. Aeromotive, Inc.*, 922 F.Supp. 29, 47 (W.D.Mich.1996).

cent of those interviewed were familiar with TSA, while 44% were familiar with A & F. Of the five stores, interviewees were least familiar with A & F.

4. Although 95% of those interviewed correctly identified TSA as a sporting goods store, 52% could not categorize A & F; 38% described A & F as an apparel store; and 10% as a sports store.

5. Nielsen next showed the interviewees advertisements from TSA and clothing imprints from A & F and asked the interviewees:

> Do you believe Abercrombie & Fitch needed permission from The Sports Authority to use "original outdoor authority"?

The survey found that 63% of those interviewed did not believe that permission was necessary, 29% believed that A & F needed TSA's permission to use the phrase "Original Outdoor Authority," and 8% did not know. Nielsen considered this "substantial actual confusion."

6. Nielsen then showed the interviewees an A & F clothing imprint which contained the phrase "AF. U.S. PAT. OFF." She asked whether each interviewee thought the phrase referred to the word "Abercrombie," to the words "Original Outdoor Authority," or to both phrases. Forty-two percent believed the phrase applied to both; 32% believed it applied to "Abercrombie"; 7% believed it referred to "Original Outdoor Authority"; and 1% believed it referred to neither "Abercrombie" nor "Original Outdoor Authority." Nielsen concluded that statistically, 49% believe that the phrase applies to "Original Outdoor Authority."

■ A & F argues that this survey evidence should be excluded because it lacks sufficient indicia of trustworthiness. Valid consumer surveys can be significant probative evidence of actual confusion. *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 775 (8th Cir.1994), *cert. denied*, 513 U.S. 1112, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995). Nevertheless, "[t]he proponent of a consumer survey has the burden of establishing that it

was conducted in accordance with accepted principles of survey research." *National Football League Properties v. New Jersey Giants*, 637 F.Supp. 507, 513 (D.N.J.1986). The Federal Judicial Center's most recent edition of the *Manual for Complex Litigation* states that "assessment of the validity of a survey should take into account whether":

- the population was properly chosen and defined;
- a the sample chosen was representative of that population;
- the data gathered were accurately reported; ...
- the data were analyzed in accordance with accepted statistical principles....
- the questions asked were clear and not leading;
- the survey was conducted by qualified persons following proper interview procedures; and
- the process was conducted so as to ensure objectivity (e.g., was the survey conducted in anticipation of litigation and by persons connected with the parties or counsel or aware of its purpose in the litigation?).

*Manual for Complex Litigation, Third* § 21.493 (1995).

When analyzed under the Federal Judicial Center's criteria, TSA's survey is deficient. Nielsen has not indicated how the survey population was defined, and the Court cannot determine whether the sample was representative. Further, Nielsen asked a leading question to elicit evidence of confusion, presenting a side-by-side comparison of an A & F label and a TSA newspaper advertisement—two items not typically analyzed side-by-side. She also asked an apparently biased question, i.e., she only asked whether A & F needed TSA's permission to use the word "authority," and not whether TSA needed A & F's permission. Finally, the objectivity of the survey is questionable given Nielsen's earlier unsupported prediction in her affidavit that there would be confusion between the parties' uses of "authority."[4]

4. Prior to conducting the survey, Nielsen stated:

When I have conducted market studies and

TSA contends that A & F's objections to the survey go to its weight and not to its admissibility. Even though the survey was leading and apparently lacked objectivity, and although the Court lacks sufficient knowledge of the survey population, total exclusion is inappropriate. A & F has not pointed to any case excluding survey evidence on a motion for summary judgment. *See, e.g., The Mennen Co. v. The Gillette Co.,* 565 F.Supp. 648, 652–53 (S.D.N.Y.1983), *aff'd,* 742 F.2d 1437 (2d Cir.1984) (excluding survey evidence based on, *inter alia,* "the prompting and suggestive nature of the question" at a bench trial). As the United States Court of Appeals for the Eighth Circuit stated:

> [W]e note that most of [defendant's] arguments concerning flaws in the survey (e.g., the definition of the sample and the form of questions asked) do not render the issue of actual confusion beyond genuine dispute, rather they go to the weight the trier of fact should place on the survey's results.

*Insty\*Bit, Inc. v. Poly–Tech Indus.,* 95 F.3d 663, 671 (8th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1085, 137 L.Ed.2d 219 (1997). The survey evidence will be weighed in the Court's assessment of A & F's motion for summary judgment.

## V. Motion for Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.* 25 F.3d 1320, 1323 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)). In so doing, "the court must construe the evidence most strongly in favor of the party opposing the motion." *United States v. Hodges X–Ray, Inc.,* 759 F.2d 557, 562 (6th Cir.1985).

### A. Trademark Infringement

■ To maintain an action for trademark infringement under 15 U.S.C. § 1114,[5] TSA must prove (1) ownership of the mark; (2) continuous use; (3) secondary meaning if the mark is descriptive; and (4) a likelihood of confusion among consumers. *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1105 (6th Cir. 1991). The first two factors are not in dispute. TSA has trademark registrations as evidence of ownership; most relevant to this action is its registration No. 1,245,417 for "authority" (Attachment 1). As for the second factor, there is no opposition to the assertion that "authority" has been continuously used, either by TSA or a predecessor owner.[6]

■ As for the third factor, A & F argues that "authority" is descriptive.[7] *See Cham-*

---

surveys involving well-known specialty retailers who offer merchandise having a common mark, the results of such surveys always show that there is some portion of the respondents who believe that there is an affiliation or sponsorship between the retailers.... In this case, I believe consumers would associate the use of "Authority" by Abercrombie & Fitch with the well-known "Authority" marks of TSA. This would result in a segment of the consumers believing that there was an affiliation or sponsorship between TSA and Abercrombie & Fitch.

5. TSA's claim of trademark infringement under Michigan common law is governed by the "likelihood of confusion" standard. *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 833

(6th Cir.1983). Thus the Court's analysis under the Lanham Act will also apply to TSA's common law claim.

6. In disputing incontestability of "authority," A & F argues that TSA has not shown the mark to have been in continuous use for five years. For this factor of trademark infringement, however, A & F raises no objection to continuous use.

7. Another court may have held that "The Sports Authority" is a descriptive trademark. *See The Sports Authority, Inc. v. Prime Hospitality Corp.,* 877 F.Supp. 124 (S.D.N.Y.1995), *vacated,* 89 F.3d 955 (2d Cir.1996). The finding is not relevant; here the concern is with the characterization of "authority."

*pions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1117 (6th Cir.1996) (describing a "merely descriptive term" as one that "describes a characteristic or ingredient of an article"). The United States Patent and Trademark Office (USPTO), however, has registered the mark on its principal register. Registration on the USPTO's principal register creates a presumption that the mark is not descriptive. *Id.* at 1118. For purposes of the motion for summary judgment, the Court will presume that "authority" is not a descriptive mark.

The fourth factor is the one principally at issue: whether there is a likelihood of confusion among consumers. This factor looks to whether the public could believe that TSA endorses A & F's use of "authority." *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center,* 109 F.3d 275, 280 (6th Cir.1997) ("The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."); *Holiday Inns, Inc. v. 800 Reservation, Inc.,* 86 F.3d 619, 623 (6th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 715 (1997) ("The general requirement underlying a showing of the likelihood of confusion is that the public believes that 'the mark's owner sponsored or otherwise approved the use of the trademark.' ").

▇ In assessing likelihood of confusion, the Court must examine:

(1) strength of plaintiff's mark;

(2) relatedness of the [goods];

(3) similarity of the marks;

(4) evidence of actual confusion;

(5) marketing channels used;

(6) likely degree of purchaser care and sophistication;

(7) intent of defendant in selecting the mark; and

(8) likelihood of expansion of the product lines using the marks.

*Id.* (citing *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville Inc.,* 670 F.2d 642, 648 (6th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982)).

### 1. Strength of Mark

TSA asserts that "authority" is incontestable and therefore must be "considered strong and worthy of full protection." *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1187 (6th Cir.1988) (*Wynn Oil I* ). In order for a mark to be incontestable, it must be registered on the principal register of the USPTO and have been in continuous use for five years.[8] 15 U.S.C. § 1065. Assuming that "authority" meets this criteria, the Sixth Circuit has stated that courts must give "full effect to incontestable trademarks." *Wynn Oil I,* 839 F.2d at 1187.

▇ A & F argues that it may nonetheless make fair use of "authority" to describe its history and reputation. To prevent a trademark holder's monopoly on the descriptive aspects of a word, the Lanham Act allows a fair use defense to a trademark holder's incontestable, exclusive rights to a mark. Another party may use an incontestable mark if

the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark ... of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin. . . .

15 U.S.C. § 1115(b)(4). The Second Circuit justifies this exception because an "action for trademark infringement involves the principle that the public's right to use language and imagery for descriptive purposes is not defeated by the claims of a trademark owner to exclusivity." *Car–Freshner Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267, 268 (2d Cir.1995).

▇ To be entitled to the defense of fair use, A & F must (1) use "authority" merely

---

8. A & F suggests that TSA has not met the burden of showing that "authority" has been in continuous use for five years, as TSA only recently acquired rights to the mark. A & F, however, does not otherwise oppose incontestable status.

The Court will assume for the purposes of the summary judgment motion that the mark has been in continuous use for five years and is therefore incontestable.

to describe its services or product; (2) refrain from using the word as a trademark; and (3) use the word in good faith. *Munters Corp. v. Matsui America, Inc.*, 730 F.Supp. 790, 800 (N.D.Ill.1989), *aff'd*, 909 F.2d 250 (7th Cir.), *cert. denied*, 498 U.S. 1016, 111 S.Ct. 591, 112 L.Ed.2d 595 (1990).

■■■ A & F has satisfied the Court that it uses "authority" to describe its century-long tradition of outfitting customers for the outdoors.[9] Its use of "authority" is generally not prominent: it is buried in textual discussion about A & F's reputation, coupled with descriptive words such as "protection" and "quality," and dwarfed by the words "Abercrombie & Fitch" or "Abercrombie." While TSA asserts that modern-day consumers do not recognize A & F's history, this argument does not diminish A & F's right to invoke its tradition.

Although TSA asserts that A & F has used "authority" in bad faith, there is no evidence of such, and TSA relies merely on the allegation. TSA also argues that the term "authority" is "meaningless" to A & F executives. TSA disingenuously misconstrues Wexner's and Jeffries's testimony to arrive at this conclusion. Although both men described A & F's use of "authority" as unimportant, both Jeffries and Wexner testified in other portions of their depositions that they were aware of and sought to capitalize on A & F's history and reputation in the retail marketplace. When they responded that use of the word "authority" was "meaningless," Jeffries and Wexner were merely explaining that the words "Abercrombie & Fitch" or "Abercrombie" were the important parts of hangtags, labels, and logos. Specifically, when Jeffries testified that "authority" was "meaningless," he was responding to a line of questioning addressing placement of patent and trademark symbols in close proximity to "authority."

Nevertheless, A & F's placement of patent and trademark symbols near the phrase "authority" could suggest that A & F used the word as a trademark, which would preclude a fair use defense. *See Munters Corp.*, 730 F.Supp. at 800. Even if the patent and trademark symbols do not designate the word "authority" as a trademark, such placement diminishes the descriptive nature of A & F's use.

Although A & F principally makes fair use of "authority" as a descriptive term, some of A & F's merchandise might create a likelihood of confusion. In such cases, A & F may argue that, despite its incontestable status, the mark "authority" is weak for the purposes of likelihood of confusion. TSA in turn contends that if "authority" is incontestable, it is automatically strong in a likelihood of confusion test. *See Wynn Oil I*, 839 F.2d at 1187.[10] Since *Wynn Oil I*, however, the

---

9. It is of no matter that "authority" is not classified as "descriptive" in the hierarchy of trademarks. *See Champions Golf Club*, 78 F.3d at 1117. "What matters is whether the *defendant* is using the protected word or image descriptively, and not as a mark." *Car–Freshner*, 70 F.3d at 269.

10. The Sixth Circuit has been criticized for equating incontestability with strength for the purposes of likelihood of confusion. *See Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 600 (6th Cir.1991) (*Wynn Oil II*). With the exception of the Eleventh Circuit, all other circuits that have considered this issue have rejected the Sixth Circuit's position. *See, e.g., The Sports Authority v. Prime Hospitality Corp.*, 89 F.3d 955, 961 (2d Cir.1996) ("[I]ndependent indicia of strength [other than incontestability] is relevant to deciding whether the strength of the mark weighs in favor or against a finding of likelihood of confusion."); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 935 (4th Cir.1995) ("[I]ncontestability affects the validity of the trademark but does not establish the likelihood of confusion necessary to warrant protection from infringement. Likelihood of consumer confusion remains an independent requirement for trademark infringement."); *Munters Corp. v. Matsui America, Inc.*, 909 F.2d 250, 252 (7th Cir.1990), *cert. denied*, 498 U.S. 1016, 111 S.Ct. 591, 112 L.Ed.2d 595 (1990) ("*Park 'N Fly* does not preclude consideration of a mark's strength for purposes of determining the likelihood of confusion."); *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir.1988) ("[A]n incontestable status does not alone establish a strong mark."); *Oreck Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 166, 171 (5th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987) ("Incontestable status does not make a weak mark strong.").

These courts limit the Supreme Court's language in *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985), to initial consideration of whether a mark is strong enough to be protected under the Lanham Act. In *Park 'N Fly*, the Supreme Court held

Sixth Circuit has said that incontestability confers only a presumption of strength in the likelihood of confusion test. *Wynn Oil II*, 943 F.2d at 600. Lower courts have presumed strength from incontestability, but they have also proceeded to examine evidence that rebuts that presumption. *See, e.g., Aero–Motive Co.*, 922 F.Supp. at 37–38 (examining evidence of third-party usage of the incontestable mark).

■ There is evidence in the record that many third parties use "authority" to describe their services or products, and this could weaken it as a mark. *Homeowners Group*, 931 F.2d at 1108 ("[C]ourts have found extensive third-party uses of a trademark to substantially weaken the strength of a mark."). A & F says that there are 42 active applications and registrations for trademarks containing the word "authority" for retail services. A & F also cites four current uses of "authority": (1) Workout Authority (label on a t-shirt); (2) The Color Authority (flyer by Janovic Paint Centers); (3) Authority (brochure from Petsmart, Inc.); and (4) The Color Authority (label on blankets by Fieldcrest).

The Sixth Circuit has recently clarified that third-party use of the mark must be in the relevant market or industry in order to weaken the mark under the likelihood of confusion test. *Daddy's Junky Music Stores*, 109 F.3d 275, 281. As for third-party use of "authority," at least one current use, the "Workout Authority," is in a sports-related industry. TSA says that it has persuaded users of "Workout Authority" to cease such use, and it is pursuing investigations of the other three alleged current uses. A & F's search also revealed that third parties use "authority" often in the apparel industry and occasionally in sports-related markets, although it is not known whether such use is current. Third-party use of "authority" is, at best, inconclusive. A & F's evidence does not necessarily destroy the strength of TSA's mark, but the strength of "authority" is in some doubt.

In sum, A & F is generally entitled to use "authority" descriptively, but in certain situations, it does not make fair use of a descriptive term. What is necessary is to analyze A & F's more prominent use of "authority" for possible infringement under the remaining factors.

## 2. Relatedness of Goods

■ Under this factor, TSA and A & F's products shall be placed into three possible categories:

(1) cases in which the [goods] of the parties are in direct competition, "in which case confusion is likely if the marks are sufficiently similar"; (2) cases in which the "[goods] are somewhat related but not competitive, so that the likelihood of confusion may or may not result depending on other factors"; and (3) cases in which the "[goods] are totally unrelated, in which case confusion is unlikely."

*Champions Golf Club*, 78 F.3d at 1118 (quoting *Homeowners Group*, 931 F.2d at 1108). TSA and A & F sell some similar goods, like flannel shirts and rain slickers. Yet TSA does not say that A & F is its "direct" competitor. Instead, TSA reserves that distinction for a sporting goods store like Galyan's, which also sells hardline sports equipment. Further, TSA and A & F's goods have never appeared side-by-side on a shelf in direct competition. TSA and A & F's goods are "somewhat related" but not directly competitive.

## 3. Similarity of Marks

■ "Similarity of marks is a factor of considerable weight." *Daddy's Junky Music Stores*, 109 F.3d 275, 282–83. Here the question is whether representations of "authority" will "be confusing to the public when singly presented." *Champions Golf Club*, 78 F.3d at 1118. "The appearance of the litigated marks side by side in the courtroom does not accurately portray actual market conditions. In addition to the sound or appearance of the marks, a host of other factors help to pierce the unreality of simple comparisons and re-

that an infringing use of an incontestable mark may not be defended on the grounds that the mark is merely descriptive. *Id.* at 196, 105 S.Ct. at 662. The Supreme Court did not consider the

impact of this holding in the likelihood of confusion test, and went on to remand the case for assessment of likelihood of confusion. *Id.* at 205, 105 S.Ct. at 667.

veal the operative facts of the real world." *Homeowners Group,* 931 F.2d at 1106.

Ultimately, TSA's mark is not similar to A & F's use of "authority," which is typically used descriptively beneath the prominent store name "Abercrombie & Fitch." The most compelling similarity is found in the parties' uses of the phrase "outdoor authority." There is no evidence that TSA has registered this phrase, though TSA says that it has applied to register it. TSA apparently uses the phrase exclusively in newspaper advertising or on the Internet. TSA pairs "authority" with other words as well, proclaiming itself as the "Superbowl Authority" as well as the "Knife Authority."

A & F has proclaimed itself the "outdoor authority" on various garments, but not in mass-market advertising as has TSA. In A & F's use of the phrase, the words "Abercrombie & Fitch" or merely "Abercrombie" are more prominently displayed and dominate "authority."

On balance, A & F's and TSA's uses of "authority," even when coupled with the word "outdoor," are not similar. As noted, TSA uses the phrase exclusively in advertising in print and electronic media. A & F, however, uses the phrase on garments, beneath its more prominently displayed store name. *See The United States Shoe Corp. v. Brown Group, Inc.,* 740 F.Supp. 196, 200 (S.D.N.Y.), *aff'd,* 923 F.2d 844 (2d Cir.1990) ("The fact that defendant's print advertisement includes prominent references to its own distinctive brand name makes it even less likely that consumers will confuse defendant's ad as coming from the same source as plaintiff's advertisements.").

4. Evidence of Actual Confusion

The survey evidence of actual confusion has previously been described. Nielsen showed the interviewees a TSA newspaper advertisement and website logo denoting the phrase "outdoor authority," as well as an A & F t-shirt imprint with the phrase "original outdoor authority." The interviewees looked at the images, side-by-side:

Nielsen then asked:

> Do you believe Abercrombie & Fitch needed permission from The Sports Authority to use "original outdoor authority"?

This is a leading question. The interviewees were confronted with two logos not usually seen side-by-side and were implicitly directed to find a relationship between them. The result was that 29% believed that A & F needed TSA's permission to use the phrase "original outdoor authority."

Such an approach is problematic in survey evidence of actual confusion. *See Blockbuster Entertainment Group v. Laylco, Inc.*, 869 F.Supp. 505, 514 (E.D.Mich.1994) ("[T]his question to some extent asks respondents to look specifically for a relationship between two of the store names, and is therefore a leading question."). In *Blockbuster*, however, the district court accorded some weight to the survey evidence because experts testified that it complied with accepted survey methodology. *Id.*

TSA's survey is not so well supported. As noted above, it has a number of defects, and it is entitled to little weight as to actual confusion. TSA has therefore not shown appreciable actual confusion regarding A & F's use of the word "authority."

> 5. Marketing Channels Used and Degree of Purchaser Care

Consideration of the marketing channels used looks to "how and to whom the respec-

tive goods or services of the parties are sold." *Champions Golf Club,* 78 F.3d at 1120 (quoting *Homeowners Group,* 931 F.2d at 1110). Many of the TSA and A & F stores are located in the same general geographic areas; geography does not separate their customers. Nielsen said in an affidavit that the two parties' goods are sold in similar channels of trade. The Court will assume that the customers of TSA and A & F constitute substantially the same market.

■ As for the degree of sophistication in customers, they meet the standard of "the typical buyer exercising ordinary caution." *Id.* (quoting *Homeowners Group,* 931 F.2d at 1111). Nothing indicates that the nature of TSA and A & F's goods requires a greater measure of care in purchasing.

### 6. A & F's Intent and Likelihood of Expansion

■ TSA says that A & F has used "authority" with intent to capitalize on TSA's success and with intent to expand its product line to sporting goods stores to compete with it. TSA supports these assertions with nothing more than conjecture.

TSA essentially argues that A & F began to use "authority" upon discovering TSA's use of the word. TSA says that Limited then purchased Galyan's with the intent of placing A & F name-brand goods for sale in its stores. In this way, Limited, through its wholly-owned subsidiary A & F, would directly compete with TSA and undermine its "authority" mark.

The argument is too strained to be credible. First, TSA has not offered any direct evidence of devious intent. Second, for circumstantial proof, TSA has acknowledged that A & F began using the word "authority" in 1989–90, and then points to Limited's purchase of Galyan's in 1995—a connection too attenuated in time to show that A & F chose "authority" with an eye to later compete directly. Finally, TSA asserts that A & F will sell its merchandise in Galyan's, citing only the *Sports Trend* article as evidence. In the article, the writer himself called his view "juicy speculation." In sum, the article

is not sufficient to establish that A & F intends to capitalize on TSA's goodwill.

### 7. Applying Summary Judgment Standard to the Factors

■ "In order to avoid summary judgment in a Lanham Act case . . . the nonmoving party must establish that genuine factual disputes exist concerning those factors that are material to whether confusion is likely in the marketplace as a result of the alleged infringement." *Holiday Inns,* 86 F.3d at 622–23. The *Frisch* factors "are simply a guide to help determine whether confusion would be likely to result from simultaneous use of the two contested marks. . . . '[T]he general concept underlying likelihood of confusion is that the public believe that "the mark's owner sponsored or otherwise approved of the use of the trademark." ' " *Wynn Oil I,* 839 F.2d at 1186 (quoting *Here's Johnny Portable Toilets,* 698 F.2d at 834). After weighing the relevant factors, the Court concludes that there is no genuine issue of material fact that a likelihood of confusion exists in A & F's use of "authority."

To be sure, both TSA and A & F have separately proclaimed themselves the "outdoor authority," but this similarity does not necessarily establish a likelihood of confusion between their merchandise. A & F's use of "authority" is not similar enough to engender confusion among consumers, particularly given that "Abercrombie & Fitch" or "Abercrombie" always dominate A & F's use of "authority." As stated above, similarity of the marks is "a factor of considerable weight," *Daddy's Junky Music Stores,* 109 F.3d 275, 283, and this factor weighs in A & F's favor. Further, because the parties are not in direct competition, their respective products avoid direct consumer comparison.

TSA's potentially most damaging allegation—i.e., that A & F will directly challenge TSA by placing its merchandise with the word "authority" in Galyan's, another hardline sporting goods store—is speculation based on a single editorial in a trade magazine. TSA "is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Gregg v. Allen–Bradley Co.,*

801 F.2d 859, 861 (6th Cir.1986). Finally, TSA's survey evidence of actual confusion is flawed and ultimately not significant enough to overturn the weight of the other factors.

Summary judgment on TSA's trademark infringement claim must be granted in A & F's favor.

### B. Unfair Competition

■ TSA says that A & F's use of "authority" violates 15 U.S.C. § 1125(a) because it amounts to unfair competition. This claim mirrors the claim for trademark infringement under the Lanham Act and likewise depends on a showing of likelihood of confusion. *Champions Golf Club*, 78 F.3d at 1123. There is no genuine issue of material fact regarding the absence of likelihood of confusion. The Court will dismiss this claim as well.[11]

### C. Dilution

■ TSA says that A & F's use of the word "authority" dilutes its mark in violation of 15 U.S.C. § 1125(c)(1). Under 15 U.S.C. § 1125(c)(1), a party with a "famous" mark is entitled to an injunction against other parties' use of the mark, which could "dilute" its distinctiveness. To maintain an action for dilution, TSA must prove that:

(1) its mark is distinctive and famous; and

(2) the defendant's use of the same or a similar mark creates a likelihood of dilution through tarnishment or blurring.

*American Express Co. v. CFK, Inc.*, 947 F.Supp. 310, 314 (E.D.Mich.1996).

■ In assessing the famous nature of "authority," the Court must consider factors such as its "degree of inherent or acquired distinctiveness"; the "duration and extent of use"; and "the nature and extent of use of the same or similar marks by third parties."

15 U.S.C. § 1125(c)(1)(A)—(B), (G). Here the Court can draw upon the analysis of the strength of "authority" for likelihood of confusion. As shown above, there is current third-party use of "authority." Whether or not it is in the relevant market, such use diminishes any "distinctive or famous" aspects of "authority." "Authority" is not so famous as to deserve protection under the federal dilution statute. Summary judgment will be granted in A & F's favor on this claim.

### D. False Advertising

■ TSA also says that A & F has engaged in false advertising in violation of 15 U.S.C. § 1125(a). TSA points to the fact that although A & F makes no claim to the mark "authority," it places the word in close proximity to trademark and patent symbols.[12]

■ The Sixth Circuit has not extensively addressed false advertising claims under the Lanham Act. Standards of the Second Circuit, which has addressed this cause of action in great depth, will be applied. The Second Circuit has said:

In order to recover damages or obtain equitable relief [for a false advertising claim], a plaintiff must show that either: (1) the challenged advertisement is literally false, or (2) while the advertisement is literally true it is nevertheless likely to mislead or confuse consumers.

*Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992).

TSA's survey evidence shows some confusion as to whether patent and trademark symbols apply to A & F's use of the word "authority." Nielsen showed 200 interviewees the following A & F clothing imprint:

---

11. TSA also claims unfair competition under Michigan common law. It has not briefed an argument in support of the claim. Other courts have disposed of Michigan unfair competition claims along with an analysis under the Lanham Act. *See, e.g., Chrysler Corp. v. Newfield Publications, Inc.*, 880 F.Supp. 504, 511 (E.D.Mich. 1995). Accordingly, TSA's unfair competition claim under Michigan law will be dismissed.

12. TSA also alleged that, contrary to A & F's representations on labels and hangtags, A & F's goods are not "durable," as that word generally applies to hardline goods "such as washing machines, refrigerators, and the like." A & F argues that it uses the word "durable" in the sense of "lasting," and that it is therefore entitled to describe its clothing as durable. In its opposition papers, TSA has apparently abandoned this claim, and it does not counter A & F's argument. The Court will therefore treat the claim as abandoned.

Forty-two percent of the interviewees believed the patent symbol applied to both "Abercrombie" and "Original Outdoor Authority"; 32% believed it applied to "Abercrombie" alone; 7% believed it referred to "Original Outdoor Authority"; and 1% believed it referred to neither. Nielsen concluded that, statistically, 49% of those interviewed believe that the patent symbol applies to "Original Outdoor Authority."

Although TSA has not briefed its argument on its false advertising claim, TSA has apparently offered this survey evidence to show that "while the advertisement is literally true it is nevertheless likely to mislead or confuse consumers." *Johnson & Johnson*, 960 F.2d at 297. The survey evidence may not necessarily prove such confusion, but is enough to cause survival of this narrow claim.

### E. Unjust Enrichment

Finally, TSA says that A & F has been unjustly enriched through its violations. Under Michigan law, the doctrine of unjust enrichment exists so that a "person shall not be allowed to profit or enrich himself inequitably at another's expense." *McCreary v. Shields*, 333 Mich. 290, 293, 52 N.W.2d 853 (1952). TSA's only remaining claim is for false advertising. As it can conceivably argue that A & F was unjustly enriched through placement of patent and trademark symbols, TSA's claim of unjust enrichment under Michigan common law will not be dismissed, but it is limited to the consequences of the allegation of false advertising.

### F. Dismissal of Limited and Mast as Defendants

There is a genuine issue of material fact as to whether Limited and Mast have anything to do with A & F's designs for logos, hangtags, and labels. Although the vice president and chief financial officer of A & F says that A & F personnel make all design decisions, Gobé testified that Wexner was involved in the design process. Further, Mast apparently manufactures clothing for A & F. Therefore Limited and Mast will not be dismissed as defendants at this time.

### VI.

For the reasons stated above, A & F's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

TSA's federal claims of trademark infringement, unfair competition, and dilution, and its state law claims of trademark infringement, unfair competition, and dilution, are DISMISSED. TSA's federal claim of false advertising and state law claim of unjust enrichment continue, and Limited and Mast are still in this case as defendants.

SO ORDERED.

Int. Cl.: 25

Prior U.S. Cl.: 39

## United States Patent and Trademark Office

Reg. No. 1,245,417
Registered Jul. 12, 1983

## TRADEMARK
Principal Register

## AUTHORITY

Londontown Corporation (Delaware corporation)
Londontown Blvd
Eidersburg. Md 21784

For: APPAREL—NAMELY. RAINWEAR. JACKETS. COATS. SUITS. SLACKS AND VESTS. in CLASS 25 (U.S. Cl. 39)
First use May 11, 1982; in commerce May 11, 1982.

Ser. No. 360,111, filed May 24, 1982

FRANCIE R GOROWITZ. Examining Attorney

ATTACHMENT 1